**E-FILED**
Monday, 04 March, 2013  02:54:23 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE A. KINDHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-3440 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Julie A. Kindhart appeals from the denial of her application for Social Security Disability Insurance Benefits ("Disability Benefits") under Title II of the Social Security Act.  42 U.S.C. §§ 416(i), 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) .  Kindhart has filed her Brief in Support of Motion for Summary Judgment (d/e 10), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e12).  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  <u>Consent to Proceed Before a  United States Magistrate and Order of Reference</u>, entered November 02, 2012 (d/e 14).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

STATEMENT OF FACTS

Kindhart was born on December 10, 1955.  She completed the eleventh grade and secured a GED.  She also completed two years of college course work, but did not receive a degree.  In addition, she had training as a secretary and certified nursing assistant (CNA).  R. 45-46. She last worked in August 2009 as a CNA at the Quincy, Illinois, Veterans' Home (VA Home).   Kindhart suffers from bipolar disorder; borderline personality disorder; polysubstance abuse; and postoperative effects of rotator cuff surgery, ankle surgery, and carpel tunnel release surgery.  She also complains of pain in her hips, knees, and back.

On July 26, 2005, a psychiatrist, Dr. Terry M. Killian, M.D., performed an independent medical examination of Kindhart for fitness for duty for Kindhart's employer, the VA Home.  Dr. Killian found her unfit for duty because of her depressive episodes.  He diagnosed her with bipolar mood disorder, type II, with the current episode depressed with agitation.  R. 293. Dr. Killian's recommendations included treatment by a psychiatrist, modification of her medication, and a substance abuse evaluation.  He also recommended another fitness examination before she returned to work. R. 293.

On February 2, 2007, Dr. Killian performed another fitness examination. Kindhart was under the care of a psychiatrist, Dr. Salvador Sanchez, M.D., and taking several medications for her mental condition. Dr. Killian noted that Kindhart's mood was much improved. Her speech was at a normal rate, her thought processes were coherent and goal directed, her intellectual functioning appeared to be normal, and her judgment appeared to be good. R. 293. Dr. Killian opined that Kindhart was receiving a good quality of psychiatric care and was much improved. He opined that she could return to work immediately without any restrictions, except, possibly random drug testing for substance abuse. R. 293-94.

Kindhart returned to work at the VA Home. In September 2007, Kindhart injured her shoulder when a patient grabbed and twisted her arm. R. 326. Kindhart went to see Dr. Steven Morton, O.D., for her shoulder pain. Dr. Morton treated her shoulder with injections and physical therapy. R. 309, 311, 317. Her pain, however, persisted.

On January 9, 2008, Kindhart went to the Blessing Hospital Blessing Behavioral Center.[1] Kindhart reported being sad, depressed, tearful, and

---

[1] The doctor's signature on the record is not legible, but appears to be that of her psychiatrist, Dr. Salvador Sanchez, M.D. See R. 411. Dr. Sanchez's signature appears on the records from both the Blessing Behavioral Center and Transitions of Western Illinois, discussed below. Counselors also signed some records at Transitions of Western Illinois.

unstable, which was affecting her work performance.  She reported that she may lose her job.  R. 287.

On January 18, 2008, Kindhart went to see Dr. Morton.  Kindhart was complaining of shoulder pain.  Dr. Morton noted that Kindhart was "a little bit argumentative" during the examination.  R. 317.  Dr. Morton noted inconsistencies in Kindhart's statements about the efficacy of the injections. Kindhart first said that the injections provided no relief.  Kindhart then said that the first injection provided 100 percent pain relief, the second injection provided less relief, and the third injection provided no relief.  Dr. Morton recommended studies of Kindhart's cervical spine to see if the pain was coming from her neck, but Kindhart "would not let me get any further evaluation of her cervical spine."  R. 317.  Dr. Morton stated that surgery would not provide the relief she wanted.  R. 317.

Dr. Morton filled out a return to work slip authorizing Kindhart to return to work on January 28, 2008.  Dr. Morton opined that Kindhart could return to work, but was limited to lifting, pushing or pulling no more than 20 pounds, and also no stretching of the left arm.  R. 314.

On February 4, 2008, Kindhart went to seek Dr. Morton for her shoulder.  Dr. Morton noted that he did not think surgery would relieve Kindhart's pain.  He recommended an MRI of the cervical spine.  R. 311.

Dr. Morton filled out a return to work slip, authorizing Kindhart to return to work on February 6, 2008.  Dr. Morton again opined that Kindhart could return to work, but was limited to lifting, pushing or pulling no more than 20 pounds, and also no stretching of the left arm.  R. 310.

On April 5, 2008, the VA Home placed Kindhart on administrative leave because she reported that she dreamed she shot three of her supervisors.  R. 291.

On April 9, 2008, Kindhart went to the Blessing Behavioral Center. She reported that she had a distressing dream that she shot people at work.  She reported that the dream was under investigation and she was on administrative leave.  She reported that she was told she was a threat. Kindhart reported that she had 1½ years before she could retire.  R. 284.

On April 16, 2008, Kindhart saw Dr. William Holt, M.D., for a second opinion on her shoulder.  R. 309.  Dr. Holt also recommended an MRI of the cervical spine.  He also stated, "I would share [Dr. Morton's] concern that there may only be a limited amount that can be done to help this patient."  R. 309.

On April 17, 2008, Dr. Killian performed a third independent medical examination of Kindhart for fitness for duty.  The VA Home sent her for the examination because of Kindhart's dream about shooting her supervisors.

Dr. Killian opined that Kindhart's bipolar disorder was in remission and she was fit for duty. He again opined that Kindhart had a problem with substance abuse, primarily alcohol. Kindhart reported drinking a six-pack of beer every other night. R. 298. Dr. Killian concluded, "I find Ms. Kindhart is currently in remission from her bipolar mood disorder, and that she does not have any significant psychiatric symptoms which would prevent her from performing the duties of her position or prevent her from working in a safe fashion." R. 300. He further opined that any problems with her behavior on the job, "appears to be the result of resentment that she carries regarding her job, and not due to her psychiatric condition." R. 300 (emphasis in the original). Dr. Killian, however, would not predict whether Kindhart would harm anyone, "I cannot state with any degree of psychiatric certainty whether Ms. Kindhart presents a real risk of violence toward coworkers or supervisors, but I believe that it is unlikely but not out of the question." R. 300.

On July 21, 2008, Kindhart saw Dr. Darr Leutz, M.D., for her shoulder pain. R. 326-28. Dr. Leutz found tenderness on palpitation and some reduced strength. Dr. Leutz diagnosed rotator cuff tendonitis, adhesive capsulitis of the shoulder, bicipital tendonitis, and subacromial bursitis. Dr. Leutz recommended surgery. R. 328.

On July 30, 2008, a state agency psychologist, Dr. Joseph Mehr, Ph.D., reviewed Kindhart's medical records and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment.  R. 330-47.  Dr. Mehr identified Kindhart's condition is bipolar disorder in remission with medication, personality disorder, and alcohol abuse.  R. 333, 337, 338.  Dr. Mehr opined that Kindhart's mental conditions resulted in moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration.  R. 340.  Dr. Mehr opined that Kindhart could remember locations and work-related procedures; understand and remember instructions for simple actions of routine and repetitive type; carry out very short and simple instructions; maintain attention and concentration for extended periods; perform at a regular, acceptable pace requiring only common numbers and lengths of rest breaks; get along well with coworkers or peers without expressing inappropriate behavior; and engage in generally socially appropriate behavior in setting with reduced interpersonal contact.  R. 344-46.

On August 8, 2008, a state agency physician, Dr. Sandra Bilinsky, M.D., reviewed Kindhart's medical records and prepared a residual

functional capacity assessment.  R. 348-55.  Dr. Bilinsky opined that Kindhart could lift 20 pounds occasionally and 10 pounds frequently; sit/stand or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never could climb ladders, ropes, or scaffolds; had limited ability to push and pull with her upper extremities; and had limited ability to reach with her left arm due to her shoulder injury.  R. 350-51.

On August 22, 2008, Dr. Leutz performed surgery on Kindhart's shoulder.  R. 386.  After the surgery, Kindhart underwent physical therapy.  R. 381.  On September 24, 2008, Dr. Leutz stated in a return to work note that Kindhart could return to work at full duty on October 20, 2008.  R. 385.

On September 11, 2008, Kindhart went to Transitions of Western Illinois for counseling.  She reported that she had been out of her medications for two weeks.  She was anxious.  She reported that she would find out if she had her job back at the end of October.  Kindhart was irritable, lacked a strong support system, ate one meal a day, had poor and fragmented sleep, and had fleeting suicidal ideas.  R. 409-10.  Dr. Sanchez prescribed medication and scheduled her to return in six weeks.  R. 411.  The records were signed by Dr. Sanchez and Kindhart's case manager and counselor, Tim Baker.

On September 15, 2008, Kindhart saw Baker at Transitions of Western Illinois.  Baker gave Kindhart a Global Assessment of Functioning Scale (GAF) score of 50.  R. 402.  He formulated an individualized service plan for Kindhart for the next six months.  R. 402-04.

On September 29, 2008, Kindhart went to Transitions of Western Illinois.  She reported being anxious and having panic attacks with agoraphobia.  She reported that she was unable to function and unable to leave the house.  Dr. Sanchez adjusted her medication.  R. 418, 420.

On November 7, 2008, a state agency psychologist, Dr. Phyllis Brister, Ph.D., reviewed and affirmed Dr. Mehr's opinions.  R. 387-89.

On November 12, 2008, a state agency physician, Dr. David Mack, M.D., reviewed Kindhart's medical records and prepared a residual functional capacity assessment.  R. 390-97.  Dr. Mack opined that Kindhart could lift 20 pounds occasionally and 10 pounds frequently; could sit/stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; never could climb ladders, ropers, or scaffolds; should avoid repetitive pushing and pulling with her left upper extremity; and had limited ability to reach with her left extremity.  Dr. Mack noted limited range of motion in the left shoulder.  R. 391.

On December 1, 2008, Kindhart went to Transitions of Western Illinois for counseling.  She was upset and reported that her past employer was not going to let her come back.  She reported low energy and poor sleep and appetite.  R. 450-51.

On January 19, 2009, Kindhart was informed that she could no longer get her medications through a grant program that had been supplying them.  R. 459.  The notes from her February 9, 2009, sessions at Transitions of Illinois indicate that she was receiving her medications at that time.  The notes state that one medication, Abilify, was being discontinued.  R. 463.

On March 11, 2009, Kindhart went to Blessing Behavioral Center.  She reported one panic attack a week.  She reported feelings of hopelessness and some fleeting thoughts of death.  She reported improved energy and anxiety.  R. 433.

On May 6, 2009, Kindhart went to see Blessing Behavioral Center.  Kindhart reported that she had occupational stressors and that she became easily overwhelmed.  The handwritten notes state, "(Is pt. able to work?)".  R. 430.  Kindhart reported that she was not depressed.  R. 430.

On July 7, 2009, Kindhart was discharged from counseling at Transitions of Western Illinois due to lack of participation.  R. 442.

On September 1, 2009, Kindhart went to Blessing Behavioral Center. Kindhart reported that she had been suspended at work because she was accused of making threats.  Kindhart stated that she had not made any threats.  R. 429.  On examination, Kindhart's memory and concentration were good, her appetite was good, she was sleeping well, and she had fair energy and motivational level.  R. 429.  Her anxiety, agitation and irritability were deemed situational.  R. 429.

On or about December 22, 2009, Kindhart fell and broke her right ankle while walking her dogs.  R. 508.  On December 23, 2009, Dr. Ronald Wheeler, M.D., performed ankle surgery on Kindhart to fix the fracture. R. 504-06.  On January 12, 2010, Kindhart saw Dr. Wheeler for a follow up after the surgery.  Dr. Wheeler noted that her wounds were healing well. Dr. Wheeler replaced the cast with a short leg cast and stated that he would recheck in four to six weeks with X-rays out of the plaster cast. R. 507.

On March 10, 2010, Kindhart went to see Blessing Behavioral Center. Kindhart reported that she was arrested for using too much cold medication and would be on probation for two years.  Kindhart said she was "always suicidal."  R. 510.  She declined hospitalization.  R. 510.

On March 17, 2010, the Administrative Law Judge (ALJ) conducted an evidentiary hearing in Hannibal, Missouri.  Kindhart appeared in person and with her attorney.  A vocational expert Susan Entenberg also appeared by telephone.  R. 42-43.

Kindhart testified first.  She testified that she was 54 years old at the time of the hearing.  She was divorced and lived alone in a two-story house.  She testified that she was 5 feet 7 inches tall and weighed 160 pounds.  R. 45.  She testified that she last worked in August 2009, as a CNA at the VA Home.  She testified, "I was set up.  They did not want me . . . ."  R. 47.

The ALJ asked Kindhart to describe her physical conditions that did not allow her to work.  Kindhart testified that she broke her ankle.  She also testified that her ankles, knees, hips, and back all hurt.  She testified that her ankles and knees "grind and they crack."  R. 48.  She also testified that she had carpal tunnel in both wrists.  R. 48.  She testified that she had the wrong surgery performed in her shoulders and "I have to live with it."  R. 48.  She also testified that her neck hurt.  R. 49.

Kindhart testified that the pain in her back was "a very dull pain, a heavy pain."  R. 57.  The pain in her wrists was "a sharp electrical pain."

R. 57.  Her knees "grind and they crack and they feel like severe Charlie horses."  R. 58.  Kindhart testified that her shoulders swell "if I overdo." R. 58.  She testified that the pain in her ankles, knees, and wrists was constant.  Her back hurt when she stood too much or sat in a chair too long.  She testified that bending over hurt, too.  R. 58.  Physical activity made the pain worse.  R. 58.  She testified that she relieved the pain in her legs by elevating them and icing them until the swelling subsided.  She testified though, "But as soon as I get on them, they just start swelling up on me again."  R. 58.

Kindhart testified that she had trouble walking and standing.  She testified that she had trouble sitting because her ankles swell.  She also stated that she had difficulty lifting and carrying things.  R. 49.  Kindhart testified that her primary care physician restricted her from lifting more than 20 pounds, but her orthopedist restricted her from lifting more than 10 pounds.  R. 50-51.  She testified that her only current medication was Paxil for her bipolar disorder.  R. 51.

Kindhart testified that in a typical day, she woke up between 12:00 p.m. and 3:00 p.m.  Once she was awake, she usually would lie in bed and watch television.  R. 52.  She testified that she ate when she was hungry, usually around 8:00 p.m. or 9:00 p.m.  She testified, "I sleep about 20 hours

a day."  R. 52.  She testified that she lived in a bedroom on the ground floor of her house next to a bathroom.  R. 52.

Kindhart testified that she could groom and bathe herself.  She did her own grocery shopping, "when my animals need the food."  R. 53.  She testified that she had four dogs and three cats.  R. 53.  She testified that she took two weeks to do her laundry.  She washed dishes and swept the floors when she had to.  R. 53.  She did not have hobbies and did not exercise.  R. 53-54.  She testified that she did not see friends or family and did not belong to any churches, clubs, or other organizations.  R. 56.

Kindhart testified that she could lift a gallon of milk with her left hand.  She testified that her right wrist was worse.  She testified that she could carry one or two sacks of groceries and a gallon of milk from her car to her house.  She testified that she had to put one down to open the door.  R. 59.  Kindhart could not estimate how long she could stand or sit at one time, or how far she could walk.  R. 60-61.

Kindhart testified that she had bipolar disorder and multiple personality disorder.  She said that, as a result, she hated authority figures and liked to work by herself.  R. 54.  She testified that she has been seeing Dr. Sanchez for the last nine or ten years for her mental condition.  R. 54-

55.  She also testified that she saw a therapist at Transitions of Western Illinois for two or three months.  R. 55.

Kindhart testified that when she went out, she had problems with people "when they act stupid."  R. 57.  She testified that she became agitated.  R. 57.  She testified that she had difficulty concentrating and could not focus on one thing.  R. 57.

Kindhart testified that she stopped drinking three years before the hearing.  She testified that before that, "I would drink occasionally."  R. 61. She testified she would drink on "Weekends, when I didn't have to work the next day."  R. 61.  She testified that she would drink a 12-pack of beer at one time.  R. 61.  She testified that she last used illegal drugs ten years before the hearing.  R. 62.  She testified that she had been charged with buying too much ephedrine in a month.  The Court takes judicial notice that ephedrine is a precursor ingredient used to manufacture methamphetamine, and possession of ephedrine with intent to manufacture methamphetamine is a crime in Illinois.  <u>See</u> 720 ILCS 646/10 and 646/20.[2] Kindhart testified that she bought extra because her cat chewed up her pills.  R. 62.  She testified that the criminal matter was still pending.  R. 62.

---

[2] The record does not indicate the specific charges brought against Kindhart.

On examination by her attorney, Kindhart testified that before she broke her ankle, she would stand for about seven minutes at one time when she washed dishes.  She testified that before she broke her ankle, she could not stand in one place because her ankles would swell.  She testified that she did not walk her dogs before she broke her ankle. R. 64.  She testified that she took two weeks to do her laundry, "Because I didn't want to do it."  R. 65.  She testified she had four loads of laundry to wash.  R. 65.

Kindhart testified that her supervisors harassed her.  She testified that she hated working with someone else.  She liked working alone. R. 66.  She testified that the dietary department at the VA Home set her up to have her fired.  R. 66-67.

The vocational expert Entenberg then testified.  ALJ asked Entenberg the following hypothetical question,

> Assume a hypothetical individual in the age range of 52 to 54, education at GED level, certified as a CNA, [INAUDIBLE] limited to light work, never climb ladders, ropes or scaffolds, no overhead reaching with the left upper extremities, and further limited to simple, repetitive tasks.  How would these restrictions – well there would be no past work, is that right?

R. 69.  Entenberg responded, "Correct."  R. 69.  The ALJ then asked Entenberg for entry level jobs that such a person could perform.  Entenberg responded, "Jobs such as light housekeeping, in the area approximately

9,000 . . . .  Food preparation workers, about 5,000 . . . .  Packer about 5,000 . . . ."  R. 70.

The ALJ then asked Entenberg for the number jobs that fit the restrictions given at the light and sedentary level.  Entenberg opined that 50,000 jobs existed at the light level and 10,000 at the sedentary level. R. 70.

The ALJ then asked Entenberg to assume the additional restriction that the person needed to have only occasional contact with coworkers and supervisors and no contact with the public.  Entenberg opined that those restrictions would not change the person's ability to perform the specific jobs that she previously listed.  R. 70.  She testified that the restriction would reduce the gross number of jobs that the person could perform by about 20 percent, to 40,000 jobs at the light level and 8,000 jobs at the sedentary level.  R. 70.

Entenberg opined that if Kindhart was totally credible, then Kindhart could not work because Kindhart testified that she slept 20 hours a day and could not be around people.  R. 70.  The hearing was then concluded.

## DECISION OF THE ALJ

The ALJ issued his decision on May 21, 2010.  R. 23-34.  The ALJ followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant

to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).

If true, Step 3 requires a determination of whether the claimant is so

severely impaired that he is disabled regardless of the claimant's age,

education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To

meet this requirement at Step 3, the claimant's condition must meet, or be

medically equivalent to, one of the impairments specified in 20 C.F.R. Part

404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d),

416.920(d).  If the claimant's impairments, combination of impairments, do

not meet or equal a Listing, then the ALJ proceeds to Step 4.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  The ALJ must

determine the claimant's RFC in order to perform this analysis.  If the

claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(f),

416.920(f).

The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Kindhart met her burden at Steps 1 and 2.  She was not engaged in substantial gainful activity and she suffered from severe impairments of status post left rotator cuff surgery, bipolar disorder, personality disorder, and polysubstance abuse.  R. 25-26.   The ALJ did not include the broken ankle as a severe impairment because the ankle was healing, and so, the impairments from the break were temporary and not expected to last more than twelve months.  R. 26.

At Step 3, the ALJ found that Kindhart's impairments or combination of impairments did not meet or equal any Listing.  The ALJ specifically considered the Listing for affective disorders, Listing 12.04.  The Listing is divided into three paragraphs, A, B, and C.  Kindhart met the requirements of paragraph A because she has bipolar disorder.  Listing 12.04.A.3.  To meet the Listing, however, the claimant's impairments must also meet the requirements of either paragraphs B or C, as follows:

B. [The effects of the affective disorder must result] in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.04.B & 12.04.C.  The ALJ found that Kindhart had only moderate limitations in the categories set forth in subparagraphs B.1, B.2, and B.3, and no episodes of decompensation.  The ALJ relied on Kindhart's daily activities and the evidence in the medical record.  R. 27.  The ALJ further found that Kindhart did not meet any of the three subparagraphs of paragraph C.  R. 28.

At Step 4, the ALJ found that Kindhart had the RFC to perform light work in which she could never climb ladders, ropes, or scaffolds, or reach overhead with her left extremity; and, in addition, the job must be limited to simple, repetitive tasks involving only occasional contact with coworkers and supervisors and no contact with the general public.  R. 28.  In making this finding, the Court relied on the 2008 examination by Dr. Killian; Dr. Sanchez's treatment notes; and the opinions of Drs. Bilinsky, Mack, Mehr, and Brister.  The Court noted that the RFC was "more generous" to Kindhart than the agency doctors' opinions would warrant.  R. 32.

The ALJ found that Kindhart's testimony about the severity of her impairments was not credible.  The ALJ cited Kindhart's testimony that she slept 20 hours a day as incredible.  The ALJ also stated that her testimony that she only drank occasionally on weekend nights when she did not work the next day was not credible, and her testimony that she did not use illegal drugs was not credible.  The medical records did not support her claim about sleeping 20 hours a day; Dr. Killian's 2008 report stated that Kindhart drank a six-pack of beer every other night; treatment notes "consistently show polysubstance abuse;" and "she was recently arrested, according to her testimony, for attempting to make methamphetamine."  R. 32.  The ALJ

also noted that Kindhart took care of seven pets by herself, and she testified that she could carry two bags of groceries and a gallon of milk. R. 32.

The ALJ found that Kindhart met her burden at Step 4 to show that she could not perform her past relevant work as a CNA.  The ALJ relied on the RFC determination and the testimony of Entenberg.  R. 33.  At Step 5, the ALJ found that Kindhart could perform a significant number of jobs in the national economy.  The ALJ relied on the RFC, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and Entenberg's testimony that Kindhart could perform 40,000 light and 8,000 sedentary jobs existing in the region.  R. 34.  The ALJ, thus, concluded that Kindhart was not disabled.

Kindhart appealed the decision of the ALJ.  On August 3, 2011, the Appeals Council denied Kindhart's request for review.  R. 15.  The ALJ's decision, thus, became the decision of the Commissioner.  R. 15.  On November 1, 2011, the Appeals Council granted Kindhart an extension of time to file an action for judicial review.  R. 1.  Kindhart then filed this action for review of the decision of the Commissioner.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The ALJ's findings at Steps 1 and 2 are supported by Kindhart's work record and medical records.  The medical records support the conclusion that Kindhart did not suffer from other severe physical impairments.  Kindhart cites no

evidence in the medical records to support her claims of swelling ankles and pain in her knees, hips, and back. The ALJ found that Kindhart's ankle would heal, and so, was not a severe impairment. The records from Dr. Wheeler support this finding.

The decision at Step 3 that Kindhart did not meet Listing 12.04 is supported by Dr. Killian's 2008 examination in which he found her fit for duty and by the opinions of Drs. Mehr and Brister.

The RFC determination at Step 4 is supported by the opinions of Drs. Bilinsky and Mack; by Dr. Morton's return to work slips that authorized lifting 20 pounds; and by Dr. Leutz's return to work slip that stated that Kindhart could return to full duty after shoulder surgery. The RFC finding is also supported by the 2008 examination of Dr. Killian in which he found that she was fit for duty, and by the opinions of Drs. Mehr and Brister. Given the RFC determination, the finding that she could not perform her past work as a CNA is supported by substantial evidence. The ALJ's finding at Step 5 that Kindhart could perform a substantial number of jobs that exist in the national economy is supported by Entenberg's opinions. The ALJ's decision that Kindhart was not disabled, therefore, is supported by substantial evidence.

Kindhart argues that the ALJ erred in finding that Kindhart did not meet Listing 12.04.  The Court disagrees.  Dr. Killian opined that she was fit for duty; Dr. Mehr opined that she had only moderate limitations and restrictions in the relevant areas of subparagraph B.1, B.2, and B.3 of Listing 12.04; and Dr. Brister affirmed these opinions.  These medical opinions provide substantial evidence to support the finding that Kindhart's impairments did not meet paragraph B of Listing 12.04.  Kindhart provided no evidence that she met any of the subparagraphs of paragraph C.  She did not need a highly supportive living arrangement; she lived alone with no help from anyone.  She presented no evidence of any episodes of decompensation, and she presented no evidence that she is so poorly adjusted that she could not handle minimal changes in her life.  For example, she suffered a broken ankle and did not suffer an episode of decompensation.  Rather, she has managed to continue living by herself.

Kindhart argues that she meets Listing 12.04 because Baker, her counselor, found that she had a GAF of 50.  Baker is not a physician so his opinion, although possibly relevant, is not evidence from an acceptable medical source.  See 20 C.F.R. § 404.1513(a).  Furthermore, a GAF score does not necessarily correspond to a person's functional limitations.  See American Psychiatric Association, Diagnostic and Statistical Manual of

Mental Disorders 9DSM-IV-TR), at 33-44 (4th ed. Text Revision 2000).

The ALJ, thus, did not err in relying on the opinions of Drs. Killian, Mehr,

and Brister rather than a counselor's GAF score.  Kindhart's other

arguments regarding Listing 12.04 are similarly unpersuasive.  The ALJ did

not err is finding that Kindhart did not meet Listing 12.04.

Kindhart also argues that the ALJ erred in making his RFC

determination.  Her arguments are not persuasive.  The opinions or

statements of Drs. Morton, Leutz, Bilinsky, Mack, Killian, Mehr, and Brister

all support the ALJ's RFC finding.  These opinions clearly constitute "such

relevant evidence as a reasonable mind might accept as adequate" to

support the decision.  Richardson, 402 U.S. at 401.  The other matters in

the record cited by Kindhart do not convince the Court otherwise.   The ALJ

RFC determination is supported by substantial evidence.

Lastly, Kindhart argues that the ALJ erred in finding her testimony not

to be credible.  This Court will not review the ALJ's credibility

determinations unless the determinations lack any explanation or support in

the record.  Elder, 529 F.3d at 413-14.  The ALJ explained the basis for his

credibility finding, and the explanation has support in the record.  The ALJ

noted the inconsistencies between her testimony and the medical records

about her use of alcohol and illegal drugs and her incredible testimony that

she slept 20 hours a day.  This evidence supports the finding that Kindhart

was not fully credible.  The Court, therefore, will not disturb the ALJ's

credibility finding.

WHEREFORE the Defendant's Motion for Summary Affirmance

(d/e12) is ALLOWED, and Plaintiff's Brief in Support of Motion for Summary

Judgment (d/e 10) is DENIED.  Summary judgment is entered in favor of

Defendant Commissioner and against the Plaintiff.  The decision of the

Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:     March 4, 2013


_____*s/ Byron G. Cudmore*_____
UNITED STATES MAGISTRATE JUDGE